Bland, Chancellor.
This case having been set down for hearing by the plaintiffs upon the bill and answers thereto alone; and having been submitted on their part without argument ; and the solicitors of the defendants having on the 28th of March last filed a note in which they say, that ‘the counsel for the defendants having understood that this case is set down for hearing at the present term; and that the object of complainants is to obtain against the defendant Law a decree to account. They, therefore, respectfully submit to the Chancellor, whether the complainants are entitled to any such decree; no such relief having been prayed in the bill, and no foundation having been laid for the same.’ Upon which the proceedings were read and considered.
One of the plaintiffs, McKim, as assignee of his co-plaintiff Moore, claims the one-half of the schooner Beauty, as tenant in common with the defendant John Odom. The plaintiffs complain that the defendants Imw, Harrison, and Odom, have refused to account with them for the proceeds of this vessel, which has been sold, and her earnings. And by their bill pray, that one-half of those proceeds and earnings may be delivered over to them, or that they may have such other relief as is best adapted to the nature of their case. <
When a case is set down for hearing, as this has been, on the bill and answers alone, every thing contained in the answers, including the exhibits which constitute a part of them, being prayed to be made so, are necessarily admitted by the plaintiff to be true in every particular, so far as it maybe at all pertinent and applicable to the case set forth in the bill; because, if the plaintiff does not contest the answer by putting in a replication to it, he thereby admits it to be true ; and even if he should have put in a replication ; yet, if he afterwards, without laying the defendant under a rule to proceed, brings the case to be heard on bill and answer, *410 the answer must, in like manner, be taken to be true in all points; because the opportunity which the defendant had of proving his answer, is thereby as effectually taken from him as if no replication had been filed, (a)
It is also an established rule, that when any one of two or more defendants makes out a defence which goes to the whole case, as regards himself, at least, the bill must be dismissed ; and where a complete bar as to the whole case is thus established by any one defendant; and there can be no relief granted against any one defendant without including all of them, the bill must be dismissed totally as to all. (b)
In the manner, and upon the principles on which this case has been presented to the court, its nature and extent must be collected chiefly from the answers. It is perfectly clear, that the President, Directors and, Company of the Franklin Bank of Baltimore, and William F. Anderson, had not, at any time, any connexion or concern with this case, further than as the mere supposed holders of the identical proceeds of the schooner Beauty, and her earnings. Considered as such, they were properly enough made parties so far as any benefit was expected to be derived from an injunction. But the injunction which was granted, having been dissolved, they are now detained here for no purpose; their answers conclusively shew, that the plaintiffs can have no relief whatever against them; and, therefore, as to them, the bill must be dismissed.
As to the other parties, it is quite evident, that it will be impracticable to reach the justice of the case without an account; indeed it is what all seek as the only means of obtaining that to which each deems himself entitled. All that has been said about the nature, value, and proceeds of the cargo of the schooner Beauty, must be laid aside as foreign to the matter in controversy between these parties. McKim and Odom were tenants in common of this vessel; and as such, each of them is entitled to one-half of the net proceeds of the sale which has been made of her, and also to one-half of her freight and earnings on her voyage from Baltimore until she was sold. The firm of Law Sf Harrison, and George Law, are entitled by their contract with the owners of *411 this schooner, and by the nature of their agency, to retain so much of the proceeds of this vessel and her earnings, which have come to their hands, as will reimburse them for all disbursements and advances made by them, as well on account of her voyage to the West Indies as of that which she made to Montevideo.
The auditor, therefore, will so state the account as to shew the amount claimed for disbursements by the firm of Law Harrison, and also by George Law. The amount of proceeds which came to the hands of Law Sr Harrison, of George Law, or of John Odom, if in fact any has been separately received by each, or any of them. The one-half of the net amount of the proceeds of this schooner and her earnings will be decreed to McKim, and the other half to Odom. Interest is to be estimated as usual on receipts and payments. The object of this account is to ascertain the exact amount to which McKim and Odom are, each of them, entitled; and of whom they are to obtain payment.
Whereupon it is Decreed, that as regards the President, Directors and Company of the Franklin Bank of Baltimore, and William F. Anderson, the bill of complaint be and the same is hereby dismissed with costs to be taxed by the register. Decreed, that the complainants and the defendants George Law, William G. Harrison and John Odom, account with each other of and concerning the disbursements made for the outfit and use of the said schooner Beauty on her voyage to the West Indies, and afterwards to Montevideo ; and also as to the proceeds of the sale of the said vessel and her earnings, as in the proceedings mentioned. That the auditor state the account relative thereto from the evidence and proceedings in the case, and such other evidence as may be laid before him by either party. The said account to be returned to this court for further order, and subject to the exceptions of either party. And it is further Ordered, that the plaintiffs and defendants Law, Harrison and Odom, be and they are hereby authorized to take testimony before the commissioners in the city of Baltimore, to be used in stating the account as aforesaid, on giving three days notice as usual. Provided, that the same be taken and filed on or before the 15th of May next.
On the 12th of May, 1828, the defendant Law, by his petition on oath, stated, that the testimony of William P. Matthews, a witness competent and proper, who was then beyond the limits of the state, was necessary to sustain his case, &c. Whereupon *412 he prayed, that he might have a commission to take testimony; and that the time for collecting and returning evidence might be enlarged.
12th May, 1828.
Bland, Chancellor.■
Ordered, that the time limited for the returning and fding of testimony authorized to be taken by the interlocutory decree of the 4th of April last, be and the same is hereby extended to the 15th of October next. That the parties be and they are hereby authorized to take out a commission for the purpose of taking testimony in any foreign country, to be read in evidence in this case, on naming and striking commissioners as usual. Provided, that such commission be returned on or before the 15th of October next; or that good cause be then shewn why the same, with reasonable diligence, could not have been returned by that time.
Soon after which the plaintiffs, by their petition on oath, stated various matters and things in relation to the grounds upon which this last order had been granted; and objected to the enlargement of the time for collecting and returning testimony; alleging, that the sole object of the defendant Law, was an unjust and unreasonable delay. Upon which they prayed, that the order of the 12th instant might be rescinded.
16th May, 1828.
Bland, Chancellor.
The petition of the plaintiffs, this day filed, having been submitted, has been read and considered.
The time limited for taking and returning testimony in relation to the accounts directed to be stated by the interlocutory decree of the 14th of April last, was, as is usual in cases where there is nothing in the proceedings from which what may be deemed a reasonable time for that purpose can be inferred, and the parties have not been heard upon that subject, fixed at a very short period. And therefore I did not consider it proper on the 12th instant to exact from the party, on that, his first application for an extension of the time, such strict proof of the necessity of having it enlarged, as I should have done on a second application of the same nature, or as would be required to obtain the continuance of a case standing regularly for hearing; therefore it is Ordered, that the aforesaid petition be and the same is hereby dismissed with costs.
On the 20th of June, 1828, these plaintiffs „ filed another bill against these same defendants, in which the ownership, voyage, *413 and sale of the schooner Beauty, is set forth as in the first bill; and after stating as before, that the proceeds of sale were remitted by the Cyane, the plaintiffs aver by this bill, that the specie was received from the Cyane by the defendant Anderson, as the agent of the defendant Law; and that Anderson had carried it to Philadelphia, and covertly transmitted the whole or the greater part of it thence to Baltimore, where he had fraudulently deposited it in the Franklin Bank in his own name. The particulars of which alleged fraudulent transactions are fully described in the bill, in which it is alleged, that they were not known to the plaintiffs when they filed their first bill. And it is further alleged, that the defendant Law is insolvent and unable to pay his debts; and that the defendant Harrison had been actually discharged under the insolvent lawn Whereupon the plaintiffs prayed, that upon the dismissal of their appeal from the order of the 15th October last; and of their bill filed on the 23d of June, 1827, an injunction might be granted upon this bill to prevent the proceeds from being removed from the bank in which they had been deposited by the defendant Anderson; and for general relief, &c.
20th June, 1828.
Bland, Chancellor.
I would have it distinctly understood, that I disclaim the power to pass any order relative to a subject matter appealed from, pending an appeal by virtue of which the power of this court, in relation to such subject, may or can be decided by the Court of Appeals, to have been suspended. But I am of opinion, not however without some doubt, that I may be allowed, pending an appeal from an interlocutory order dissolving an injunction, made on the bill and answer alone, to grant another injunction upon a bill in nature of an amended bill between the same parlies, to be issued after such dismissal or termination of the appeal, as leaves the injunction dissolved according to the order appealed from. In this case however, it appears to me to be fit and proper, in order to prevent a vexatious renewal or continuance of the injunction on a state of facts which has been already considered and adjudicated upon; that the bill this day filed, and now submitted, should be considered as an amendment to that filed on the 23d of June, 1827; and that it should be so taken and answered accordingly. But as it appears, that the new facts set forth in this bill are chiefly, or altogether within the knowledge of the defendants Law, Harrison, and Anderson, it is therefore reasonable, that the injunction, to be issued after the termination of the appeal, should be subject to a motion *414 for a dissolution on the coming in of their answers thereto alone, in connexion with all the previous proceedings, (c)
Therefore it is Ordered, that upon the fact of the dismissal of the said appeal, or other final termination thereof, whereby the said injunction may be dissolved, being certified to the register of this court, an injunction be issued as prayed by the aforesaid bill of complaint. And that subpoenas now issue as in case of an amended bill. And it is further Ordered, that at any time after the defendants Law, Harrison, and Anderson, shall have filed their answers to the said bill, the court will hear a motion to dissolve the said injunction granted thereon ; Provided, that ten days notice thereof be given to the said complainants. And it is further Ordered, that a copy of this order be endorsed upon or served with the said writ of injunction hereby directed to be issued.
The appeal having been dismissed, an injunction Was accordingly issued as authorized by this order. After which the defendants Law, Harrison, and Anderson, put in their answers separately to this amended bill, in which they fully explained all the circumstances of the case, and positively denied the fraudulent transactions as charged. The defendant Law denied that he was in a condition of insolvency; but the defendant Harrison admitted that he had obtained the benefit of the insolvent laws; Upon these answers these defendants moved, according to the terms of the order of the 20th of June, to dissolve the injunction.
4th September, 1828.
Bland, Chancellor.
The motion for the dissolution of the injunction heretofore granted in this case, standing ready for hearing, the solicitors of the parties were fully heard, and the proceedings read and considered.
Upon the hearing of this motion, two affidavits were offered and heard with a reservation as to the propriety of their being thus introduced for any purpose. But since it is quite evident that they have no material bearing upon the question now to be decided, I deem it entirely unnecessary to express any opinion as to the admission of such affidavits, under any circumstances, upon the hearing of a motion to dissolve an injunction.
Whereupon it is Ordered, that the injunction granted by the order of the 20th of June last, be and the same is hereby dissolved.
*415 The plaintiffs by an application charged that the defendant Odom had left the state, and prayed leave to amend their bill, stating that fact, and praying an order of publication against him. Leave being granted, the amendment was made accordingly. Whereupon, on the 15lh of September, 1828, an order of publication was passed, warning him, ‘as being at that time out of the state,’ to appear and answer on or before the 15th of February then next. But the court on further consideration refused to proceed on this as against a non-resident defendant.
On the 12th of December, 1828, the plaintiffs by their petition, stated, that The President and Directors of the Franklin Bank of Baltimore, had been regularly returned summoned; and had refused to answer the amended bill. Whereupon the plaintiffs prayed, that a distringas might he issued against that corporation.
5th January, 1829.
Bland, Chancellor.
A plaintiff has a right to an answer to his bill from the defendant; the mere taking of a bill pro confesso, may not, in all cases, serve his purpose; hut if the defendant is beyond the jurisdiction of the court, the plaintiff can obtain no more, and must therefore help out his case as he can. If the defendant he within reach he may be compelled to answer, and the plaintiff is entitled, as of course, to the coercive process of the court, for the purpose of forcing his opponent to make a full answer to all the material allegations of his bill.,( The mode of proceeding against contumacious natural persons who neglect or refuse to answer, is well established and sufficiently energetic; but the course of proceeding for that purpose against artificial bodies or corporations, is different, more feeble, and much more tardy; there being no legislative provision for enforcing an appearance or answer from such defendants. (d)
So far as I have been able to ascertain, this is the first instance of an application to this court for coercive process against a body politic. Corporations have latterly become very numerous; and new ones are created at almost every session of the Legislature; the matter now submitted for determination, therefore, has an importance much above the interests of the case out of which it *416 arises, and requires to be carefully considered with a view to the course of proceeding in future.
Under the provincial government, corporations were framed and called into existence, as in England, either directly by or with the immediate sanction of the lord proprietary or the monarch. (e) *417 But however" they may have been originated formerly or elsewhere, it is certain that they can now only be established here by the authority of the Legislature. The multitude of bodies politic, that have been created either by the government of the province or of the Republic, most of which still subsist, may be considered, in reference to their objects, as belonging to one or othsf of three distinct classes.
The first kind are such as relate merely to the public police; which, by assuming upon themselves some of the duties of the state, in a partial or detailed form, and having neither power nor property for the purposes of personal aggrandizement, can be considered in no other light than as the auxiliaries of the government of the Republic; and consequently, as the secondary and deputy trustees and servants of the people. The right to establish, alter, or abolish such corporations, seems to be a principle evidently inherent in the very nature of the institutions themselves; since all mere municipal regulations must, from the nature of things, be subject to the absolute control of the government. These institutions being, in their nature, the auxiliaries of the government in the great business of municipal rule, cannot have the least pretension to sustain their privileges, or their existence upon any thing like a contract between them and the government; because there can be no reciprocity of stipulation; and because their objects and duties are incompatible with every thing of the nature of such a compact.
The power of acquiring and holding property, although almost always given, is by no means a necessary incident to corporations of this class; they may be established without any such capacity; as in the instance of the commissioners for emitting bills of credit. (f) The preservation of morals, and the administration of justice are the chief ends for which government has been instituted ; and infancy, insanity, infirmity, and helpless poverty have an undoubted claim upon the protecting care of the Republic, (g) Bodies politic of this class having these objects in view, are city *418 corporations; (h) levy courts; (i) county schools of the provincial or state government; (j) public colleges; (k) hospitals; (l) trustees of the poor of the several counties; (m) &c.
,The second class of corporations are such as have no concern whatever with the duties of the Republic; nor are in any manner bound tp- perform any acts for its benefit; but whose only object is the personal emolument of its members. The corporators in -such institutions may also, in some sense, be considered as trustees; but then, even in that character, they are the mere factors of individuals; and, therefore, their resignation or removal cannot divest or alter any of the rights of the individuals they represented. Each member of such an aggregation either was a proprietor at the commencement, or became so during the existence of its incorporation; and consequently, unless he has aliened his right, must continue to be so after its dissolution, A corporation not being, like a nátural person, one of the elements of society, of which government is formed, can only be considered as a creature of the law. It is the law alone which gives to it a personality distinct from that of each of its members, and confers on it the right to act by its president, directors, or agents, in a -manner analogous to that in which the government itself acts by its regularly constituted functionaries. This individuality of character, and the right so to act is, then, nothing more than a portion ■ of the power of the government with which it has been invested. It is this power which is given by the creation of a body politic, and which, by its extinguishment, is resumed, and nothing more; the rights of property vested in its several members, in all other respects, remain unaffected by its dissolution.
It is remarkable, that there is no instance of the creation of any •body politic of this description under the provincial government; •but since the establishment of the Republic they have increased ■and multiplied to a very large and still rapidly growing family, The examples of this class of corporations are the insurance companies; (n) the Free Mason societies; (o) the banks; (p) the manufacturing companies; (q) the library companies; (r) &c.
The third species of corporations partake, in many respects, of *419 the nature of the two first classes; and are such as have a concern with some of the expensive duties of the state, the trouble and charge of which are undertaken and defrayed by them, in consideration of a certain emolument allowed and secured to their members. In cases of this kind there is certainly many of the material features of a contract between the government and the corporation; there is manifestly a quid pro quo. But this contract, if it be so, is, and of necessity must be, like all others to which a government or state is a party, one of imperfect obligation as regards the stale; (s) and, as such, subject to be dealt with by the government of the state as the public good may require, on making a just compensation for any private property which may be taken for a public use. No bodies politic of this description were ever created under the provincial government; but since our independence, a great number of them have been called into existence ; such as canal companies; (t) bridge companies; (u) turnpike road companies; (w) &c.
'¡ The right and capacity to sue and be sued, is an incident to bodies politic of all descriptions; (x) even to those which have been incorporated by and are located in another state or in a foreign country, (y) It is held to be incumbent upon every body politic, not being incorporated by a public law of which the court *420 is bound to take notice, which comes into a court of justice as a plaintiff, if required, even upon the general issue only being pleaded, to shew the authority under which it has assumed to act as a corporation, (z) When called on as a defendant its corporate capacity is thus admitted, and it appears by attorney, and responds under its seal, or in the manner specially prescribed to it. (a) But there is no legislative enactment which directs in what mode a corporation of any kind may be compelled to answer in case it should neglect ,or refuse to do so.
( It is admitted on all hands, that in a suit against a corporation none of its members can be taken or personally punished, except, perhaps as a last resort, on account of any contumacy in their corporate capacity. The only mode of proceeding, either to enforce an answer or obedience to a decree is by a distringas and sequestration of the property of the body politic. (b) The state itself is regarded in many respects as a mere body politic; (c) and in the various instances where it becomes necessary to have it made a party to the litigation, it is- represented by its Attorney-General•, in which cases, the course of the court merely allows, that lie-should be attended with a copy of the bill; but he cannot be forced to answer in any manner whatever; (d) and therefore, if the bill cannot be taken pro confesso against the state, (e) the further progress of the case must await his good pleasure.
Every corporation is and must be composed of, and conducted by natural persons; yet the distinction between the natural and artificial capacities and liabilities of its members has been drawn in such a manner as to create the most serious inconvenience. A body politic, it has been quaintly said, has no soul; and therefore cannot be called on to answer under the obligation of an oath by which a natural person may be bound, (f) To avoid this difficulty the Court of Chancery has had recourse to a singular shift; which it is admitted rests on very questionable principles; it allows the secretary, book-keeper, or some one or more of the chief members of the body politic to be made co-defendants for the express purpose of obtaining an answer on oath ; which answer, contrary *421 to the general rule in other cases, is received as evidence against the corporation itself, (g) Thus allowing the plaintiff to select from among the corporators such one or more of them as he may think proper to make witnesses, and to extract from them only such proof as may be entirely responsive to his case.
It is now settled, that a corporation may be charged in actions ex delicto as well as ex contractu, notwithstanding the general rule, that they can only act and bind themselves by means of their corporate seal. For although the members of the body politic, in their corporate capacity, cannot commit a crime, or perpetrate a felony; yet, since the institution is governed by the intellectual agency of natural persons, they may cause it so far to depart from the purposes of its establishment, as, by means of its servants to commit a trespass, or tort, or unlawfully to refuse to make compensation for that by which it had been, upon its own request, materially benefited; and, therefore, redress is allowed to be had against it by an action of trespass, trover, or assumpsit, as may be best suited to the true nature of the case. (h)
The adjudications by which these modes of proceeding have been sanctioned, manifest a sensible and strong disposition in the courts of justice, so to control and modify the ancient distinction between the artificial and natural capacities of those of whom corporations may be composed, as to prevent them from withholding a disclosure of the truth; or from perpetrating wrong and fraud, under cover of their artificial capacity; because of the quaint notion that, as such, they have no soul; or because, in general, they can only act, or bind themselves in the manner prescribed by means of their corporate seal.
On the other hand it may often become necessary to proceed personally against the officers and members of a body politic, who have been entrusted with its concerns, so as to prevent them from exposing its property to seizure and loss by reason of their negligence or contumacy. In a suit against a body politic, which can only be considered as an auxiliary of the government of the Republic, it would certainly be very unjust to seize upon its pro *422 perty, and stop or embarrass its operations, merely for the purpose of compelling its mayor, president, or directors, to answer to a suit which had been brought against it. Indeed it would, in most instances, be doing a gross injury to the public, only as a means of reaching and coercing a delinquent corporator, whose separate and personal interests could not be at all affected by any such proceeding. For, the mayor and council of a city; the justices of a levy court; the governors and visitors of a college; the president and directors of a hospital, or the trustees of the poor, could not have their private interests, in any manner, affected by the most destructive sequestration that could be made of the corporate property which they held in their artificial capacity. Even with regard to bodies politic of the second class, whose sole object is the aggrandizement of their own members, it certainly must be admitted to be unjust to injure all, by an indiscriminate sequestration, merely because some one, or a few of their members have been negligent, or contumacious, in not answering to a suit as was required.
But as regards bodies politic of the third class, who collect for their members private emolument from a public benefit, these and other evils and embarrassments must arise from a rigid adherence to the notion that such a corporation can onlybe forced to respond to a suit against it by a distringas and sequestration of its property. Take the case of a turnpike road company, that had refused to answer a bill in Chancery. The road itself could not be taken and closed by virtue of a distringas or sequestration; because that, as one of the highways of the Republic, could not, nor ought not to be obstructed by any process whatever against those whose only interest in it is the toll they are allowed to exact in consideration of keeping it in repair. Consequently, in this instance, the only method by which the court could effectually levy upon its property, as a means of enforcing an answer, would be to appoint a sequestrator, or receiver, to take the place of the company’s toll-gatherer at each gate along the whole line of the road. (i)
The injury or ruin which might be brought upon a body politic by the negligence or contumacy of its officers, as well as the great delay and embarrassment in the administration of justice, that must arise from confining the tribunal, before which it is sued, *423 exclusively to the use of the process of distringas or sequestration, as the only means of enforcing an answer, is most manifest. To prevent this injury in a case which occurred in England, in the year 1776, where the warden of a body politic refused to affix the corporate seal to its answer, the Court of Chancery, in mercy to the acquiescing parties, staid its process of contempt, by which the whole corporation at large would have been affected and punished, by a seizure of their property, until the acquiescing members of the body politic could obtain from the Court of King’s Bench, a mandamus to compel the contumacious warden to affix the seal to its answer. (j)
It is one of the most valued principles of our government, and of the common law, that all men hold their situations, in this country, upon the terms of submitting to have their conduct examined and measured by that standard which the law has established; (k) and that all trustees or fiduciaries appointed for the public good, or who are entrusted with the management of the affairs of a body politic, should be within reach of the law; and in some form or other responsible, and made to perform their duty. Upon this ground, where the justices of an inferior court, or the officers of a corporation, fail to give judgment, or to discharge their duty, they may be compelled to do so by a mandamus. The superintending authority does not by its mandamus deprive them of any of their discretionary power, but merely commands them to execute their duty, to render judgment, or to make answer as they may think proper, to the end that the individual may have an appeal, or prosecute his suit to a final decision, or obtain the relief he seeks. (l) Why should not an immediate power, to this extent, in the shape of an attachment against the person, be vested in every court of justice, before which a public officer, or a body politic, may be called as a defendant? The important concerns of the public, or the rights of individuals, or of corporations, most certainly ought not to be suffered to be delayed, obstructed, or destroyed by the mere indolence, caprice, or perverseness of any one.
These difficulties and inconveniences are sufficient to shew, that a body politic ought not, in any case, to be made a defendant, unless it is indispensably necessary to do so. But there are instances, many of which have already occurred in this court, and of which this suit affords an example, where, as the law now stands, *424 a corporation must be made a party to the suit, although it has, in truth, not the least concern with the matter in dispute. Thus where the plaintiff claims a right to a sum of money deposited in a bank, or to certain shares of stock which stand on the books of the company in the name of the defendant who claims the deposite or the shares as his own, or as having an interest in it, or them, the body politic, it is held, must be made a parly to prevent the deposite or the shares from being paid away, or transferred, before the right can be determined. This, with the vast concerns of the bank, the East India, and the South Sea companies of England, had become an evil of such magnitude, that the parliament of that country interposed, and declared by law, that in all such cases it should not be necessary to make them parties, (m) But why should not a similar exemption be extended to all our joint stock companies ; and a mere notice of the pending litigation be declared equivalent to making them parties for every purpose of preventing the parting with a deposite, or the transferring of the shares of its stock until the right to it was fully decided.
All these embarrassments and delays might be removed or prevented by a few very obvious and easy alterations in the course of procedure in suits where the state is required to be represented by its Attorney-General, and against corporations. Let it be declared, that oh proof of the service of a copy of the bill upon the Attorney-General in any case where the state should appear as a defendant, he may be compelled to answer, but not on oath, by process of attachment as against other persons. That on a subpoena being returned served, the plaintiffs may obtain an attachment against corporators so summoned, or that the plaintiff may have an order of publication against a foreign corporation; or have the bill taken pro confesso as against natural persons; or that he may, in the discretion of the court, have an immediate sequestration of the property of the corporation. That in all cases the chief officer or principal members of the body politic, who have a knowledge, or who are charged with having a knowledge of the facts stated in the bill, should make oath to the truth of its answer, as if it were their own, and be subject to the like penalties. And that it should not be necessary, in any case, to make an officer or member of the body politic a co-defendant for the sole purpose of obtaining an answer on oath. And also, that the court should be *425 allowed, where the right to a deposite, or the stock of a company, was made the subject of controversy in any suit, to order the company to transfer or hold its stock, and to pay or hold dividends or deposites, as the justice of the case might require, by serving upon •them a copy of such order without making them parties to the suit. These few alterations in the course of the procedure of this court, would save to all parties, in such cases, a deal of time, trouble, and expense, which is now unnecessarily wasted. (n)
When I consider that this is the first application of its kind; that there has been heretofore no regularly settled practice in this court in relation to bodies politic; and that it has a large, and almost unlimited control over its own rules of practice, (o) I feel tempted at once to make those evidently useful alterations as to the course of proceeding against corporations. But when, on the other hand, I recollect that it has been always considered as an established principle, that this court is confined, in all material particulars, to those forms of proceeding which have been settled by the Court of Chancery of England, from which it has deduced all its modes of acting; (p) and also, that this conformity to the ancient English course of proceeding, has been, in various ways, recognized and affirmed by legislative enactments, (q) I have become satisfied that it is safest and best to leave the matter to the General Assembly, who alone are competent to alter and shorten the process in Chancery, permanently and effectually. I shall, therefore, hold myself bound to adopt and apply the ancient and known writs and process of the English Court of Chancery, so far as they have not been altered or affected by the principles of our government; or the positive provisions of our laws, in the best manner that the nature and circumstances of the case will permit.
It is said, in one of the very respectable treatises on equity pleading, that ‘in the case of a corporation aggregate, where the answer is under the common seal, the bill must pray, that a writ called a writ of distringas, may issue under the great seal, which is for the purpose of distraining them by their goods and chattels, rents and profits, until they obey the summons or direction of the court.’ (r) What is here said, however, as to the prayer of the bill, is cer *426 tainly wrong; the authorities cited warrant no such assertion, (s) And it has also been said, that a subpana is not the proper original ■process against a corporation; because it has no conscience; (t) This is also an error; for, in all cases, where a corporation is made defendant, the first and proper process for calling it in to appear and answer is the same as that used for summoning a natural person; that is, a subpana; and accordingly the bill prays for a subpana, and no other process, (u) The bill, it is true, must always ask for that original process which is suited to the nature of the case.; against natural and artificial persons a subpana is prayed for;, against non-residents an order of publication, made the substitute of a subpana, is asked; and against the Attorney-General it is prayed, that he may be attended with a copy of the bill; (w) which form of prayer, as against the Attorney-General, appears to be recognized by several acts of Assembly, (x) with only two exceptions," in which he is directed to be summoned, or served with a subpana. (y) Thése prayers are indispensably necessary, because it is an established rule, that no one is to be considered a party to the suit, against whom no process or publication is prayed, and served with it, or the publication made, (z)
If the body politic neglects or refuses to appear as required by the subpana which has been served on the mayor, president or any director or manager, or other officer, then the next process is a distringas, the form of which writ is substantially the same at law as in equity. (a) By this writ the sheriff is commanded to make a distress upon the lands and tenements, goods and chattels of the corporation; and it is endorsed thus: ‘By the court at the suit of A. B. for want of an appearance, (or answer, as the case may be.’) But in England upon the first writ the sheriff generally levies forty shillings issues; upon the alias distringas, four pounds; on the pluries distringas he levies the whole property; and on the return of the pluries a sequestration is granted. (b) Thus far there appears to be not the slightest difference to be found in the books, either as to the form of the process, or in reference to the character of the corporation to be affected by it.
*427 I can, therefore, feel myself at liberty to make no other alteration than to settle the amount in reference to the present value of money, and to declare, that upon the first distringas to compel an appearance or answer, the sheriff shall take issues or personal property of the corporation, to the amount of twenty dollars; and upon the alias distringas he shall levy forty dollars; and on the pluries distringas he shall distrain the whole of the personal estate, together with the rents and profits of the lands, (c)
If it shall be ascertained by the return of all these successive writs, that the corporation has no property upon which a distringas may be levied, or which can be taken under a sequestration, then the bill may be taken pro confesso, and the plaintiff may obtain relief accordingly; (d) or if, having no property, or after all its property has been sequestered, it still stands out, and refuses to appear and answer, then, according to what seems to he the better and more reasonable opinion, the plaintiff may have an attachment against the members; or, at least, those of them who have been duly summoned, or served with the subpoena, and thus notified of the institution of the suit, (e)
If, after a decree, the corporation neglects to comply therewith, upon being served with a copy of it according to the ancient practice, (f) as recognized by the act of Assembly; (g) now dispensed with; (h) the plaintiff may obtain a distringas to enforce obedience to it; and after the return of the first writ of distringas, he may have a sequestration; (i) and if the sheriff returns, that the body politic has nothing upon which the distringas can be levied, then the members of the corporation may be attached, or such other proceedings had according to the nature of the case, and having a proper regard to the extent of the liability of the members of the body politic, as may be deemed proper and lawful, (j)
Whereupon it is Ordered, that a writ of distringas be issued as prayed by the said petition of the plaintiffs, which writ is hereby directed to he endorsed and levied as above prescribed.
*428 Soon after which The President and Directors of the Franklin Bank of Baltimore, put in their answer, in which, as before, they admitted that a certain sum of money had been deposited in their bank by the defendant Anderson, in his own name and as his own properly; but they averred, that they were entirely ignorant of all the other circumstances set forth in the bill.
The plaintiffs by their petition stated, that the defendant Odom had gone beyond sea, where they did not know, nor when he was likely to return; that the new matter charged in their amended bill was not within the knowledge of Odom, who had appeared by solicitor,- and had answered the original bill. Whereupon they prayed, that a service of the subpoena upon Odom’s solicitor might be construed and deemed as a sufficient service upon Odom himself, so as to compel him to answer, or if he failed to do so, that they might proceed regularly as if he had been summoned.
6th July, 1829.
Bland, Chancellor.
The petition of the plaintiffs having been submitted, the proceedings were read and considered.
It appears, that the defendant Odom, who is a mariner and master of a vessel, in the merchant service, had made answer to the original bill; after which the plaintiffs filed an amended bill; but before Odom had been served with a subpoena to answer, he sailed on a voyage to a foreign port; that he is a citizen and resident of Maryland, and is as much at home as those usually are who; as mariners, are engaged in such pursuits as he is, and has been for some time past; and that he may now be expected to return soon to the United States, when he may be found at his usual residence in this state.
By the order of the 15th of September last, the plaintiffs attempted to treat Odom as a non-resident, and to proceed by publication as against an absent defendant to have their amended billj as to him, thus taken pro confesso. But, conceiving the circumstances would not warrant it, I refused to pronounce the judgment consequent upon such a course of proceeding. All the acts of Assembly, which authorize a plaintiff to proceed against a defendant by publication, relate to absconding or non-resident defendants ; but it was shewn and admitted, that the defendant Odom stood in neither of those predicaments. He is a citizen and resident of Maryland, now abroad in his proper and lawful calling, with -an intention of returning when the voyage or trade in pursuit of which he left home, shall have been accomplished. A person *429 who goes abroad, not to reside, but for the purpose of adjusting his affairs; or a sailor, who is in the habit of coming backwards and forwards, in his vocation, cannot be deemed an absconding or a non-resident defendant, (k)
It is therefore perfectly manifest, that none of the acts of Assembly relative to absconding and non-resident defendants, apply to the case of this defendant Odom. The legislature intended, by those acts, to introduce a remedy in certain cases for which it had been held to be, in all respects, beyond the power of the court to provide. The object was to substitute a public warning, through the newspapers, for a personal summons, in cases where a summons could not be served at all, or without great difficulty. For, although the service of a subpoena abroad is deemed sufficient; yet it cannot, in all cases, be effected ; and, where it can, the proof of such service is always attended with much delay and expense. Those legislative enactments, in relation to non-residents, clearly indicate, that the court, in the opinion of the Legislature, has no power to dispense with the service of process on the defendant, in the usual mode, whereby he is to be notified of, and called on to answer any matters of fact which the plaintiff has set forth as the foundation of a claim for relief against him. And this is recognized as a well established general rule by all the authorities. (l)
This, however, like almost all other general rules, has some exceptions or modifications. The court has substituted service, in several cases, where the defendant may have notice of the proceedings, and where, in case he goes out of the way, there is a person who he has named in court as his agent, and who the court can look upon as such. JBut a person named agent for a different purpose cannot be looked on in that light, (m) As in case of an injunction to stay proceedings at law, the attorney at law is such an agent, who the court can regard as one charged with the whole defence of the matter in equity; and so too, where a defendant, who lives abroad, refuses to answer, after having appeared as required by the subpoena with which he has been served, the court will order service on his solicitor to be deemed good service of a subpoena to answer an amended bill; because in all such cases there *430 is a person before the court charged with the care of the whole matter in controversy; and one who the court can, with propriety, regard as an agent having had committed to him the defence of the whole subject in behalf of the non-resident defendant. (n)
But, in this instance, a resident citizen defendant has evidently done no more than to commit his interests, in a specified case, to the management of his solicitor according to the defence expressed in his answer to the original bill. In these respects his situation is materially different from that of a contumacious non-resident defendant. The agency constituted by such a defendant is, evidently,- that of a general charge; but the confidence reposed in the solicitor, in this case, is special and particular. He has been furnished with an answer or defence exactly fitted to a given case; and therefore, now, that it has been varied by an amendment of the bill, he cannot be presumed to be charged with a defence of the modified or newly formed case; which his client, being a resident citizen, hás as clear a right to be notified of, and to answer unto for himself, as he had to consider and answer the original bill.
It has been suggested, that Odom’s answer to the amended bill must be merely formal, as he knows nothing of the new matters therein stated. But -it is impossible to anticipate how far its aspect may be changed by the answer which Odom has a right to make, and may give to this amended bill, (o) I am aware, that the case may be delayed very much by Odom’s remaining abroad; but he is a- resident citizen; and, as such, has an undoubted right to be notified of this amended bill by the service of process upon him in the usual mode, to the end, that he may, if he thinks proper, answer it for himself. And this, his unquestionable right, I have no power to impair in any way whatever, (p)
Whereupon it is Ordered, that the said petition be and the same is hereby dismissed with costs.
*431 The plaintiffs by their petition prayed leave so to amend their bill as to allege, that the defendant Odom was then a non-resident; and to pray for an order of publication against him. The leave was granted as prayed; and the bill amended accordingly. And then on motion of the plaintiffs, on the 31st of October, 1829, an order of publication was passed, in the usual form, warning the defendant Odom, to appear and answer on or before the 8th day of March then next.
On the 13th of November, 1829, the commissioners made return of their proceedings under the interlocutory decree of the 14th of April, 1828, and in the testimony, so taken and returned, there is evidence which goes to sustain some of the claims of the defendant Law for disbursements as alleged in his answer.
After the 8th of March, 1830, the plaintiffs produced a certificate of the order of the 31st of October, having been published as required. And the parties submitted to the Chancellor sundry affidavits as to the residence of the defendant Odom.
13th March, 1830.
Bland, Chancellor.
This case having been again submitted on the part of the plaintiffs, with a prayer for a decree to account; and with notes on the part of the defendants objecting to the passing of any such decree, the proceedings were read and considered.
On a careful consideration of all the affidavits filed since the passing of the order of the 6th of July last, it very satisfactorily appears, that the defendant John Odom always has been since the institution of this suit; and must still be deemed a resident of the state of Maryland; and therefore the order of publication treating him as a person who resided beyond the jurisdiction of this court, is erroneous in point of fact, and has been improvidently passed.
Whereupon it is Ordered, that the said order of the 31st of October last, be and the same is hereby rescinded.
After which the death of the plaintiff Moore, was suggested; and on the 1st of October, 1830, the defendant Odom put in his answer to this amended bill, which was, in substance, the same as his answer to the first bill. To all these separate answers of the defendants, the plaintiff put in a general replicátion. A commission having been issued, was returned and filed on the 29th of December, 1830, without any testimony having been taken under it. After which the commissioners, on the 7th of March, 1830, filed a certificate, in which they stated, that by an agreement *432 between the solicitors, the return of the commission had been delayed, at the instance, and for the convenience of the defendants, in order that they might, if they thought proper, take any testimony they wished; but that the plaintiffs were not to lose the benefit of having the commission returned as before the December term. At the following March term the case was again brought before the court.
15th March, 1831.
Bland, Chancellor.
On motion of the plaintiff’s solicitor, it is Ordered, that this case be and the same is hereby referred to the auditor, with directions to state such an account as the nature of the case may render necessary; and such other accounts as either party may require.
After which the auditor, on the 3d of June, 1831, reported and ■filed a statement of an account between John Odom, and the owners of the schooner Beauty, shewing a balance of $5,634 82, to be due to the plaintiff McKim. To which the defendants filed exceptions, and the case was again presented to the court.
10th August, 1831.
Bland, Chancellor.
This case standing ready for hearing, and having been submitted on notes by the solicitor of the plaintiff, and no one appearing for the defendants before the close of the sittings of the term according to the rule of the court, the proceedings were read and considered.
Considering the pleadings as they now stand, and the manner in which the case has been brought before the court, the general replication has denied and put in issue every thing alleged by way ••of avoidance in the answers. All which matters must, therefore, be rejected; except, in so far as they may be found to have been .substantiated by proof. The auditor was correct, therefore, in •charging Odom with the whole amount of what he, in any way, had admitted he had received as the proceeds of the sale, or for the earnings of the schooner Beauty; and in rejecting all claims for disbursements on account of that vessel of which there was no evidence, other than the answers and mere exhibits of the defendants.
There is, however, some evidence in support of some of the claims made by the defendant Law, as ship’s husband; and besides as to these the plaintiff’s solicitor, in his notes, has distinctly admitted, that the defendants are entitled to a credit for $453 23, which has not been allowed by the auditor; and therefore, the auditor’s report must be rejected, and the plaintiff McKim must have a decree for the balance.
*433 The plaintiffs by their bills claim a moiety of the proceeds of the sale and earnings of the schooner Beauty from the defendant Odom; and they resist the claim of the defendants Law $* Harrison, for any alleged disbursements made by them as ship’s husbands. As a foundation for an injunction, the plaintiffs endeavoured to identify the proceeds of the vessel from Odom to the bank, so as to have them detained there. But in this they have failed; and therefore, can have relief as prayed only against the defendant Odom. I am also of opinion, that the defendant Odom is chargeable with interest from the time when it appears that the proceeds of the vessel reached this country, and were applied beneficially to his use, and ought to have been accounted for or paid to the other joint owner of the schooner.
Whereupon it is Decreed, that the auditor’s report he and the same is hereby rejected. And it is further Decreed, that the defendant John Odom, pay or bring into this court to be paid to the plaintiff John McKim, junior, the sum of $5,181 60, with interest from the 18th of June, 1827, until paid or brought in, together with his costs in this suit, to be taxed by the register. And it is further Decreed, that the bill of complaint, as against the defendants George Imw and William G. Harrison, be and the same is hereby dismissed without costs. And it is further Decreed, that the bill of complaint, as against the defendants William F. Anderson, and The President and Directors of the Franklin Bank of Baltimore, be and the same is hereby dismissed with their costs, to be taxed by the register; the said costs to be paid by the defendant John Odom.

 Beam’s Orders, 29, 180; Forum Rom. 45; Grosvenor v. Cartwright, 2 Cas. Chan. 21; Barker v. Wyld, 1 Vern. 140; Wrottesley v. Bendish, 3 P. Will. 237, note ; Legard v. Sheffield, 2 Atk. 377; Paul v. Nixon, 1 Bland, 201, note; Estep v. Watkins, 1 Bland, 488; Wright v. Nutt, 3 Bro. C. C. 340.

 Lingan v. Henderson, 1 Bland, 236; Barker v. Wyld, 1 Vern. 140.

 Jones v. Magill, 1 Bland, 177.

 It has been since declared, ‘That any process issued by any court of this state against an incorporated company, holding and exercising franchises within said state, may be served upon the president, or any director or manager, or other officer of such company, with the same effect as if such process were served on the president and directors, or a majority of them; and such process shall be deemed to, eycry effect, service upon said corporate body.’ — 1832, ch.306, s. 5.

 1 Blac. Com. 472; The case of Sutton’s Hospital, 10 Co. 23.
CtEciLius, absolute lord and proprietary of the provinces of Maryland and Avalon, lord baron of Baltimore, &c. To all our officers and inhabitants of our said province of Maryland, and to all others whom these presents may concern, sendeth greeting, in our Lord God everlasting. Know ye, that whereas by our letters patent, under our great seal, bearing date the third day of November, in the sev** and thirtieth year of our dominion, Annoque Domini one thouáand six hundred and sixty-seven; we did grant to our well-beloved inhabitants within the city called or known by the name of St. Mary’s city, in the county of St. Mary’s, in the said province of Maryland, and the circuits, precincts, and priviledged places of the said city, not exceeding the space of one English mile square, that they the said,inhabitants, within the said city, circuits, and precincts aforesaid, shall be an incorporated city of one mayor, one person learned in the law, by the name of recorder, and six aldermen, and ten persons as common councilmen, inhabiting within the said city, for evermore. And that the said mayor, recorder, aldermen and common councilmen, shall be a body corporate and one community forever, in right and in name; and shall be, by the name of mayor, recorder, aldermen and common council of the city of St. Mary’s city, able and capable at law to be sued and to sue; and to act, execute, and do as a body incorporate; and to have succession forever; and to'that end to have a common seal; and that Philip Calvert, Esquire, one of the inhabitants of the said city, shall, for the present, be and be named mayor of the said city, for the ensuing year, and John Morecroft recorder of the same, and William Calvert, Esquire, Jerome White, Esquire, Daniel Jenifer, Garr.ett Vanswearingen, Mark Cosden, and Thomas Cosden, inhabitants also of the said city, shall be aldermen thereof as long as they shall well behave themselves therein, having first taken the oath of fidelity, as also the oath appointed by us to be taken by the mayor, aider-men and recorder of the city of St. Mary’s city; and to be administered unto them respectively by our lieutenant of the said province, for the time being; or by such person or persons as we, or our heirs, or our lieutenant of the said province, for the time being, shall from time to time authorize and appoint to administer the same. And the said mayor, recorder and aldermen, or the major part of them, shall elect and chuso ten others of the most sufficient inhabitants of the said city to be of the common council thereof, for so long time as they shall well behave themselves.— Chancery Proceedings, lib. C. D.fol. 54. — This body politic has long since been dissolved by desuetude.
Some time after the city of St. Mary’s had been thus incorporated, Ann, Queen of England, who then held the government of the province of Maryland, granted a charter incorporating the city of Annapolis. — Chancery Proceedings, lib. P. C. fol. 590; 1708, ch. 7.
The charter of the city of St. Mary’s affords an example of what, in England, are called dose corporations; that is, where the major part of the persons to whom the corporate powers have been granted, on the happening of vacancies among them, have the right of themselves to appoint others to fill such vacancies, without allowing to the inhabitants or corporators, in general, any vote or choice in the selection of such new officers. An open corporation of a city, &c., is where all the *417 citizens or corporators have a vote in the election of the officers of the corporation. Every one here, however, must have observed, that although we have, in this state, at present, no close corporations so constituted by their charter, there are, nevertheless, many instances whore so many proxies, of those who alone have a right to vote, are gathered into a few hands, as, in practice, to make such bodies politic close corporations, by means of which their then president and directors are continued in office.

 1769, ch. 14, s. 6.

 Montesq, Sp. Laws, b. 23, c. 29.

 1708, ch. 7; 1796, ch. 68

 1804, ch. 73

 1696, ch. 17; 1723, ch. 19.

 April, 1782, ch. 8

 1797, ch. 102; 1816, ch. 156

 1768, ch. 29; 1785, ch. 15

 April, 1787, ch. 20

 1821, ch. 147

 1790, ch. 5

 1808, ch. 49

 1797, ch. 35.

 Vattel Law Nation, Prelim, s. 17.

 November, 1783, ch. 23.

 1795, ch. 62.

 1797, ch. 65. In regard to the irrepealable nature of an act of incorporation, it may be well not only to bear in mind the distinctions, as explained above in the text, according to which it is quite obvious, that at least two out of the three kinds of corporations, there described, may be modified or repealed at the pleasure of the legislature, without the slightest interference with the rights of private property of any kind. But that there must also be a variety of cases in which corporations of the third class, such as turnpike roads, may have their stock, even considering it as private property, indefinitely depreciated, or, in effect, totally annihilated, without, in the opinion of any one, giving rise to a claim for compensation, as in cases where mere private property is taken, by virtue of the government’s power of eminent domain, for public use. Without going into an argument, it will be sufficient to state a case which has occurred. By the act of 1812, ch. 78, the legislature incorporated a company for making a turnpike road from Baltimore to Washington; under which the road was made, and the stock yielded a considerable dividend annually. After which the legislature, by the act of 1830, ch. 158, authorized the construction of a rail road between the same cities, and nearly parallel with the turnpike road, which was accordingly put in operation. In consequence of which the annual dividends on the stock of the turnpike road have been very materially diminished. — Currie v. The Mutual Assurance Society, 4 Hen. fy Man. 315.

 1 Blac. Com. 475.

 1 Blac. Com. 385; 4 Com. Dig. 487; Henriques v. Dutch West India Company, 2 Ld. Raym. 1532; The National Bank of St. Charles v. De Bernales, 11 Com. Law Rep. 475.

 4 Com. Dig. 487; McMechen v. The Mayor of Baltimore, 2 H. & J. 41; Agnew v. The Bank of Gettysburg, 2 H. & G. 479.

 1804, ch. 73, s. 6.

 Bac. Abr. tit. Corporations, E. 2; Lynch v. The Mechanics’ Bank, 13 Johns. 127.

 1785, ch. 36.

 Willis Eq. Plea. 7.

 2 Mad. Pr. Chan. 335; 1 Fowl. Exch. Pra. 401; Nabob of the Carnatic v. The East India Company, 1 Ves., jun., 371; S. C. 1 Hoven. Supp. 149.

 The case of Sutton’s Hospital, 10 Co. 33.

 Fenton v. Hughes, 7 Ves. 289; Dummer v. Corporation of Chippenham, 14 Ves. 253.

 Com. Dig. tit. Franchises, F. 19; Yarborough v. The Bank of England, 16 East. 6 ; The Bank of Columbia v. Patterson, 7 Cran. 299; McDonough v. Templeman, 1 H. & J. 156; The Bank of the United States v. Norwood, 1 H. & J. 423; Kennedy v. The Baltimore Insurance Company, 3 H. & J. 367; Union Bank of Maryland v. Ridgely, 1 H. & G. 419.

 Knapp v. Williams, 4 Ves. 430, note; Adley v. The Whitestable Company, 17 Ves. 324; S. C. 1 Meriv. 108; Ex parte Fowlser, 1 Jack. & Walk. 73, note; Drewry v. Barnes, 3 Cond. Cha. Rep. 311.

 Rex v. Windham, Cowp. 377.

 Sutton v. Johnstone, 1 T. R. 504.

 Bac. Abr. tit. Mandamus, D.

 2 Mad. Pri, Chan. 191.

 Some alterations have been since made by the acts of 1832, ch. 306, and 1834, ch. 89.

 Dicas v. Lord Brougham, 25 Com. Law Rep. 382.

 Digges’ Lessee v. Beale, 1 H. & McH. 71; Ringgold’s case, 1 Bland, 18.

 1785, ch. 72, s. 25 and 26; Collyer on Partn. 412,

 Coop. PI. Eq. 16.

 Harvey v. East India Company, 2 Vern. 395; S. C. Prec. Cha. 128.

 Com. Dig. tit. Franchises, F. 19.

 Willis Eq. Plea. 8; Lowten v. The Mayor of Colchester, 2 Meriv. 395.

 Willis Eq. Plea. 7; 2 Mad. Pra. Chan. 202.

 1785, ch. 72, s. 29, and ch. 78, s. 1; April, 1787, ch. 30, s. 4; 1799, ch. 79, s. 7.

 1786, ch. 49, s. 8; 1794, ch. 60, s. 6.

 Windsor v. Windsor, 2 Dick. 707; Keilly v. Ward, 5 Bro. P. C. 495; Lingan a. Henderson, 1 Bland, 245.

 2 Harr. Ent. 674; I Harri. Pra. Chan. 264; 1832, ch. 306, s. 5.

 1 Harr. Prac. Chan. 264.

 East India Company’s case, 1 Salk. 191.

 Salmon v. The Hamhorough Company, 1 Ca. Chan. 204; Curson v. African Company, 1 Vern. 121.

 Rex v. Gardner, Cowp. 85; London v. Lynn, 1 H. Blac. 206.

 2 Mad. Pr. Chan. 466.

 1785, ch. 72, s. 25.

 1818, ch. 193, s. 4.

 Harvey v. East India Company, 2 Vern. 395; S. C. Prec. Chan. 129; Com. Dig. tit. Franchises, F. 19.

 2 Mad. Pr. Chan. 466; Salmon v. The Hamborough Company, 1 Cha. Cas. 204; Adley v. The Whitestable Company, 17 Ves. 324; S. C. 1 Meriv. 107.

 White v. Greathead, 15 Ves. 2; Nelson v. Ogle, 2 Taunt. 253.

 2 Mad. Pr. Chan. 198; 1 Harr. Pra. Chan. 206; Buckingham v. Peddicord, 2 Bland, 447; Nolan v. Nolan, 12 Cond. Chan. Rep. 47, 121.

 Smith v. The Hibernian Mine Company, 1 Scho. & Lefr. 23S.

 Gildenichi v. Charnock, 6 Ves. 171.

 Angerstein v. Clarke, 1 Ves., jun., 250 ; Jopling v. Stuart, 4 Ves.-619.

 It has been since declared, that where a defendant, of full age, in any case, shall, upon two successive subpcenas, be returned non est, it shall be lawful to order publication of the substance of the bill or petition against such defendant as if a non-resident of this state, and to proceed in the same manner and to every effect, as if he were not-a resident of this state, and as if the case made in the bill or petition were within any of the acts of Assembly made in respect of absent dr non-resident defendants; Provided, that each of said subpcenas be delivered to the sheriff for service at least twenty days before the first day of the term to which it shall be returnable, 1832, ch. 302, s. 2. — Buckingham v. Peddicord, 2 Bland, 447.